MICHAEL E. KIRBY, Judge.

STATEMENT OF CASE

On November 17, 1994, the grand jury-indicted Derek Landry for the first-degree murder of Lloyd Gonzales, Jr., during the perpetration or attempted perpetration of an armed robbery, a violation of La. R.S. 14:30. Landry was tried by jury, convicted and sentenced to death.
On direct appeal to the Louisiana Supreme Court, Landry’s conviction and sentence were reversed, and the case remanded for new trial on the basis that the appellate record was “so deficient” the Court could not properly review the case. See State v. Landry, 97-0499 (La.6/29/99), 751 So.2d 214.
In April 2003, the State re-tried Landry. 'Following a three-day trial, the jury convicted Landry of first-degree murder. After he waived all delays, the court sentenced Landry on April 26, 2003, to life imprisonment pursuant to the jury’s recommendation.

STATEMENT OF FACT

At 7:15 p.m. on September 1, 1994, Officer James Daughtry and his partner, Officer Gordon Hyde, responded to a call of a shooting in the 4400 block of Annette Street. When the officers arrived at the scene, they found one victim, Lloyd Gonzales, Jr., lying in the front doorway of the residence, dead from an apparent gunshot wound to the left side of his face. The officers entered the residence where they found another victim, Lloyd Gonzales, Sr., alive and suffering from an upper body gunshot wound. Officer Daughtry called for medical assistance, notified the homicide division and secured the scene. He spoke to Mrs. Leora Gonzales, the mother and wife, respectively, of the shooting victims, who described the shooter as a light skinned black male wearing plaid shorts, weighing approximately 155 pounds and standing 5'7" to 5'10" tall. Daughtry radioed dispatch with the description, and then canvassed the neighborhood for witnesses.
Detective Joseph Catalonotto led the investigation in this case. He arrived on the scene at approximately 8:00 p.m. Lloyd Gonzales, Jr. was dead in the front doorway. Catalonotto learned that Lloyd Gonzales, Sr. had been shot also and been transported to Charity Hospital. Catalo-notto tried to speak to Mrs. Gonzales; however, she was very distraught. She described the assailant as a black male, medium build and 5'7" to 5'10" in height. Mrs. Gonzales also said that the shooter slipped while pursuing her and possibly injured his right arm. Detective Catalo-notto ordered the crime scene processed, including photographs, collection of blood samples, diagram of the premises, etc.
Five days after the shooting, Catalonot-to compiled a photographic lineup, which Mrs. Gonzales viewed, but she was unable to identify the shooter. NOPD officers arrested the defendant on October 13, 1994 for the first-degree murder of Lloyd Gonzales, Jr. Catalonotto observed the defendant immediately after his arrest, and noted a recent scar or scabbing on the defendant’s right forearm.
On September 9,1994, Detective Catal-onotto compiled a second photographic lineup, which Mr. and Mrs. Gonzales viewed separately. Mr. Gonzales identified a picture of the defendant as the shooter. Mrs. Gonzales made no identification from the photo lineup but said she *149 could identify the shooter if she saw him again.
Mrs. Leora Gonzales recounted the day of the shooting, and testified that she returned home from visiting her mother at approximately 6:00 p.m. She gathered her belongings and exited her vehicle quickly because it was raining. As she did so, the defendant approached her. Thinking she recognized him as a neighbor, she slowed to greet him. As he came closer, however, Mrs. Gonzales realized she did not know the defendant and she became frightened. She ran to her front porch and screamed for help. The defendant followed her but slipped on the front steps, injuring his arm. Mrs. Gonzales ran to the side of the porch where she cowered in the corner. Just then, her son opened the front door. The defendant shot him. Mrs. Gonzales heard the defendant fire a second shot. At that point she curled into a fetal position and waited for the defendant to shoot her. Instead, the defendant grabbed her purse and fled on foot. Mrs. Gonzales embraced her wounded son. When she did, she heard her grandson crying in the house. She entered the house to comfort the child, and discovered her wounded husband. Mrs. Gonzales described her attacker to the police that night. She confirmed her inability to identify anyone from two photographic lineups she viewed but maintained that she told police she could identify the shooter if she saw him again. Prior to the defendant’s first trial, Mrs. Gonzales identified the defendant in court as the man who shot her son and husband. She made the identification as the defendant and other prisoners clad in orange jumpsuits entered the courtroom for motions hearing.
Lloyd Gonzales, Sr. testified that he and his son Lloyd Gonzales, Jr., were at home babysitting a grandchild on the night of the shooting. Mr. Gonzales was upstairs tending the child, while Lloyd, Jr. watched television downstairs. At approximately 6:30 p.m., Mr. Gonzales heard his wife scream. As he descended the stairs, he heard a gunshot. He arrived at the front door and found Lloyd, Jr. dead in the doorway. Mr. Gonzales pushed the front door open and when he did, the defendant shot him in the chest. Because it was still daylight outside, Mr. Gonzales got a good look at the defendant. Mr. Gonzales went back inside and called the police. Following surgery and a six-day hospital stay, Mr. Gonzales returned home. Detective Catalonotto showed him a picture lineup from which Mr. Gonzales identified the defendant as the shooter. Mr. Gonzales recounted sitting in court with his wife in 1994 when she identified the defendant as her assailant and her son’s killer. The defendant entered the courtroom with several other prisoners. Immediately upon seeing the defendant, Mrs. Gonzales identified him to Mr. Gonzales.
Dr. Susan Garcia, an Orleans Parish forensic pathologist, performed an autopsy on the body of Lloyd Gonzales, Jr. She testified that the victim died from a single gunshot wound to the left side of his face. The bullet severed the victim’s brain stem, killing him instantly. Dr. Garcia opined that the killer delivered the fatal shot from a distance of ten to eighteen inches.
NOPD firearms expert Officer Kenneth Leary, Jr., compared the bullet recovered during the autopsy on the body of Lloyd Gonzales, Jr. to the bullet | ¿retrieved from surgery performed on Lloyd Gonzales, Sr. Officer Leary identified the bullets as .32 caliber, and concluded that the same gun fired both bullets.

ERRORS PATENT

A review for errors patent on the face of the record reveals none.

*150
COUNSELED ASSIGNMENT OF ERROR

In the only counseled assignment of error, the defendant complains he was denied his right to cross-examine Mrs. Leora Gonzales as to whether she told investigators about a brush burn on the shooter’s arm during the defendant’s first trial, the position or level of the shooter’s hand when he shot her son and the shooter’s height.
An accused is entitled to confront and cross-examine the witnesses against him. La. Const. Art. 1, § 16. La. C.E. art. 611(B) provides that a witness may be cross-examined on any matter relevant to any issue in the case. Due process affords a defendant the right of full confrontation and cross-examination of the State’s witnesses. State v. Van Winkle, 94-0947, p. 5 (La.6/30/95), 658 So.2d 198, 201-202. The trial court has discretion to control the extent of the examination of witnesses as long as the court does not deprive the defendant of his right to effective cross-examination. State v. Hawkins, 96-0766 (La.1/14/97), 688 So.2d 473; State v. Huckabay, 2000-1082 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, writ den., 2002-0703 (La.11/1/02), 828 So.2d 564. Evidentiary rules may not supercede the fundamental right to present a defense. Id. However, evidence may be excluded if it is irrelevant. See State v. Casey, 99-0023, pp. 18-19 (La.1/26/00), 775 So.2d 1022, 1037. La. C.E. art. 403 provides that relevant evidence may be excluded “if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.” The Article 403 balancing test may exclude a statement otherwise admissible as impeachment evidence.
Further, confrontation errors are subject to the harmless error analysis so the verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial was surely unattributable to the error. State v. Broadway, 96-2659, p. 24 (La.10/19/99), 753 So.2d 801, 817.
The State objected to the defense questioning Mrs. Gonzales with regard to whether she testified about a brush burn on the defendant’s arm during the first trial. The State argued that the defense was attempting to improperly impeach Mrs. Gonzales by showing that she had not testified about the brush burn at the 1995 trial.
At the retrial the court held an in-chambers conference to review pertinent testimony from the defendant’s first trial. It did not show that defense counsel ever posed a question about the brush burn to Mrs. Gonzales during the 1995 trial. The trial court’s ruling did not force the defense to abandon a proper line of inquiry, because there was no prior inconsistent statement with which the defense could impeach Mrs. Gonzales in this trial. Neither is there any merit to the defendant’s assertions about being denied the opportunity to question Mrs. Gonzales regarding the shooter’s height and the level of his hand when he shot the deceased. In response to defense questioning, Mrs. Gonzales testified that the shooter was 5'7" to 5'10" tall and that he held the gun “sort of waist [level]” when he shot her son.
Even assuming the trial court erred in its ruling, the error was harmless. Mr. Gonzales unequivocally identified the defendant as the shooter. He testified that the outside light afforded him ample visibility of the defendant. Moreovér, Mr. Gonzales said he looked into the defendant’s eyes for approximately ten to fifteen seconds, long enough to eliminate all possibility of misidentification. Considering the *151 evidence of the defendant’s guilt, the jury’s verdict was not attributable to any error by the trial court. This assignment is without merit.

PRO SE ASSIGNMENT OF ERRORS NUMBERS 1 AND 2

In these two pro se assignments, the defendant claims that Mrs. Gonzales identified him from a show up procedure in 1994 which was impermissibly suggestive and that the overall evidence of identification was insufficient to establish that he was the person that committed the crime.
The defendant refers to the identification that occurred in pre-trial motions in December 1994 in anticipation of the defendant’s first trial. While sitting in court awaiting the beginning of the proceedings, Mrs. Gonzales noticed the defendant, clad in an orange jumpsuit, enter the courtroom in the company of several other men in the same clothing. As soon as Mrs. Gonzales saw the defendant, she identified him to her husband as the man who killed their son and stole her purse.
The defendant in this case argues that when identity is disputed, the State must negate any reasonable probability of mis-identification in order to satisfy its burden of establishing every element of the crime charged beyond a reasonable doubt. See State v. Young, 2002-1280 (La.App. 4 Cir. 1/22/03), 839 So.2d 186, writ den. 2003-0599 (La.10/17/03), 855 So.2d 756.
An irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence. La.C.Cr.P. art. 841. The contemporaneous objection rule prevents “a defendant from gambling for a [ ¿favorable verdict and then, upon conviction, resorting to appeal on errors which either could have been avoided or corrected at the time or should have put an immediate halt to the proceedings.” State v. Taylor, 93-2201 p. 7 (La.2/28/96), 669 So.2d 364, 368-69 (citing State v. Arvie, 505 So.2d 44, 47 (La.1987)). In this case, the defendant has not shown that he lodged a contemporaneous objection to Mrs. Gonzales’ in-court or out-of-court identifications of him at either the December 1994 hearing or at the April 24, 2003 trial. As such, the issue has not been preserved for review on appeal. However, even if proper objections had been lodged, the defendant’s position has no merit.
To suppress identification, a defendant must first prove that the identification procedure was suggestive. State v. Prudholm, 446 So.2d 729, 738 (La.1984). An identification procedure is suggestive if, during the procedure, the witness’ attention is unduly focused on the defendant. State v. Robinson, 386 So.2d 1374, 1377 (La.1980).
In this case, the 1994 identification could hardly be deemed a “procedure”. Rather, the identification was more in the nature of a show up. Mr. and Mrs. Gonzales sat in court for a previous phase of this case. Mrs. Gonzales saw the defendant enter the courtroom through the portal used for such purpose and looked to see if she saw her son’s killer. Her interest stemmed from curiosity, not pursuant to any formal procedure. There is no evidence that Ms. Gonzales was subpoenaed to come to court in hopes that she would see the defendant in the courtroom and identify him as the murderer. This was not an arranged identification procedure, but an inadvertent meeting between the witness and the defendant. An immediate and definite identification resulting from an inadvertent meeting between a witness and a suspect will be found reliable and admissible 1¿where there is no indication of impropriety or suggestiveness. See State v. Holmes, 550 So.2d 249 (La.App. 4 Cir. 1989).
*152 Even assuming there was an identification “proceeding”, the defendant has failed to show it was unduly suggestive. Admittedly, the defendant was identified as a prisoner; however, he was one of several prisoners, all wearing identical clothing. There is nothing to indicate that any features such as race, height or physical markings drew undue focus on him visa-vis the other men. Neither did the defendant enter the courtroom alone. Mrs. Gonzales noted that the defendant was “the second or third” man in the group of prisoners. These facts do not support the defendant’s assertion that Mrs. Gonzales’ attention was unduly focused upon him.
Even when suggestiveness of the identification process is proven by the defendant or presumed by the court, the defendant must also show that there was a substantial likelihood of misidentification as a result of the identification procedure. State v. Prudholm, 446 So.2d at 738. The Supreme Court held in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977), that despite the existence of a suggestive pretrial identification, an identification may be permissible if there does not exist a “very substantial likelihood of irreparable misidentification.” Under Manson, the factors which courts must examine to determine, from the totality of the circumstances, whether the suggestiveness presents a substantial likelihood of misidentification include: 1) the witness’ opportunity to view the criminal at the time of the crime; 2) the witness’ degree of attention; 3) the accuracy of his prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and the confrontation. Id.
In this case, Mrs. Gonzales testified that there was plenty of daylight for her to see the defendant. She noticed his eyes and his movements and stated that he was clean cut and neat. Mrs. Gonzales consistently maintained that she could identify her attacker if she physically saw him again and never wavered from her estimation of his height as 5'7" to 5'10". Moreover, she looked her assailant in the eye for at least fifteen seconds, and emphasized that she would never forget his face.
Finally, Mrs. Gonzales’ “show up” identification of the defendant did not violate his right to counsel. As discussed in the previous assignment, the identification did not result from a lineup. Mrs. Gonzales identified the defendant from a chance encounter as he entered court for pre-trial proceedings. In State v. Hargrove, 330 So.2d 895 (La.1976), two witnesses saw the defendant being escorted into the courtroom without counsel and identified him as the perpetrator. Relying on United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the Hargrove court found no sixth amendment violation, reasoning that a defendant’s right to counsel at post-indictment line-ups does not apply to a chance encounter between a witness and the accused. This assignment has no merit.

PRO SE ASSIGNMENT OF ERROR NUMBER 3

By this assignment, the defendant claims violation of his constitutional rights by the trial court’s refusal to grant his motion for continuance when defense witness, Herbert White, failed to appear and testify at the trial.
The record does not indicate that the defendant moved for a continuance on the day of trial. There was a motion for continuance made the morning of voir dire, the day before trial; however, there are no reasons given for the motion or its denial. There is no indication Mr. White was subpoenaed or that the substance of *153 his alleged testimony was proffered for the record.
La.C.Cr.P. art. 709 provides:
A motion for a continuance based upon the absence of a witness must state:
(1) Facts to which the absent witness is expected to testify, showing he materiality of the testimony and the necessity for the presence of the witness at the trial;
(2) Facts and circumstances showing a probability that the witness will be available at the time to which the trial is deferred; and
(3) Facts showing due diligence used in an effort to procure attendance of the witness.
The trial court has great discretion in granting a recess and the denial of a motion for a recess is not grounds for reversal absent an abuse of that discretion and the showing of specific prejudice. La. C.Cr.P. 712. In order to show prejudicial error sufficient to warrant reversal, the defendant must show that the testimony the witness would have given would have been favorable to the defense and would indicate the possibility of a different result. State v. Stevenson, 02-0079 (La.App. 5 Cir. 4/30/02), 817 So.2d 343.
In this case, the defendant has not met any of the C.Cr.P. art. 709 requirements. This assignment is meritless.

CONCLUSION

For the reasons above we affirm the defendant’s conviction and sentence.
CONVICTION AND SENTENCE AFFIRMED.