STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

10-1021

STATE OF LOUISIANA

VERSUS

JAMARCUS DEWAYNE DORSEY

**********
APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT,
PARISH OF RAPIDES, NO. 298,636
HONORABLE THOMAS M. YEAGER, DISTRICT JUDGE

**********

**J. DAVID PAINTER**
**JUDGE**

**********

Court composed of Billy Howard Ezell, J. David Painter, and James T. Genovese, Judges.

**AFFIRMED WITH INSTRUCTIONS.**

**James C. "Jam" Downs, District Attorney**
**Michael W. Shannon, Assistant District Attorney**
**Ninth Judicial District**
**P.O. Drawer 1472**
**Alexandria LA 71309**
**(318) 473-6650**
**Counsel for Appellee:**
        **State of Louisiana**

**R. Shane McCormick, Attorney at Law**
**2901 Johnston Street, Suite 206**
**Lafayette, LA 70503**
**(337) 234-0492**
**Counsel for Defendant/Appellant:**
        **Jamarcus Dewayne Dorsey**

**PAINTER, Judge.**

A jury convicted Defendant, Jamarcus Dewayne Dorsey, of attempted first degree murder, a violation of La.R.S. 14:27 and 14:30, and possession of a firearm by a convicted felon, a violation of La.R.S. 14:95.1. He was subsequently sentenced to serve twenty years at hard labor without benefit of probation, parole, or suspension of sentence for attempted first degree murder and fifteen years at hard labor for possession of a firearm by a convicted felon. The sentences were ordered to run consecutively. Defendant now appeals his convictions. We affirm the convictions and instruct the trial court to amend the minutes of sentencing to correctly reflect the sentence imposed by the trial court for possession of a firearm by a convicted felon.

## FACTUAL AND PROCEDURAL BACKGROUND

Following an incident on May 7, 2009, wherein the vehicle he was driving struck a police officer, Defendant was charged by bill of information with attempted first degree murder, a violation of La.R.S. 14:27 and 14:30, and possession of a firearm by a convicted felon, a violation of La.R.S. 14:95.1. A jury convicted Defendant of the charged offenses, and he was subsequently sentenced to serve twenty years at hard labor without benefit of probation, parole, or suspension of sentence for attempted first degree murder and fifteen years at hard labor for possession of a firearm by a convicted felon. The sentences are to run consecutively. Defendant now appeals his convictions, arguing that the evidence was insufficient and that the trial court erred in denying his request that court be adjourned for one day in order to give a defense witness the opportunity to speak to the witness's attorney prior to testifying. For the following reasons, we affirm Defendant's convictions and instruct the trial court to amend the minutes of sentencing to correctly reflect the sentence imposed by the trial court for possession of a firearm by a convicted felon.

1

# DISCUSSION

*Errors Patent*

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there are two errors patent. Additionally, the sentencing minutes require correction.

First, both sentences imposed by the trial court were illegally lenient. A sentence for attempted first degree murder of a peace officer is to be served at hard labor. La.R.S. 14:27(D). Although the court minutes reflect that the court imposed this sentence at hard labor, the sentencing transcript indicates the court did not do so. "[I]t is well settled that when the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62 (citing *State v. Webster*, 95-605 (La.App. 3 Cir. 11/2/95), 664 So.2d 624). In *State v. Loyden*, 04-1558, p. 6 (La.App. 3 Cir. 4/6/05), 899 So.2d 166, 171-72 (footnote omitted), this court explained:

> This court recently considered a similar error patent, finding that the sentences imposed for aggravated battery and obstruction of justice, both of which were necessarily punishable at hard labor, were illegally lenient since the trial court failed to state that they were to be served at hard labor. *State v. Vollm*, 04-837 (La.App. 3 Cir. 11/10/04), 887 So.2d 664. Citing La.Code.Crim.P. art. 882 as our authority, we amended the sentences to indicate that they were to be served at hard labor. *Id.*
>
> Similarly, we find that the sentences imposed for the defendant's two aggravated rape convictions in this case are illegally lenient, because the trial court did not indicate that they were to be served at hard labor. Under the authority of La.Code Crim.P. art. 882, we amend the sentences imposed by the trial court to affirmatively indicate that the sentences for aggravated rape be served at hard labor. The district court is directed to make an entry in the minutes reflecting this amendment.

Consequently, the trial court's failure to order the sentence for attempted first degree murder to be served at hard labor renders it illegally lenient.

Next, the trial court failed to impose the mandatory fine required by La.R.S. 14:95.1, rendering the sentence for possession of a firearm by a convicted felon illegally lenient. However, this court will not recognize the illegally lenient sentences since they are not raised as error.

2

Next, the court minutes of sentencing require correction to reflect the sentence actually imposed by the trial court. The sentencing transcript reflects that the trial court imposed Defendant's fifteen year sentence for possession of a firearm by a convicted felon without the benefit of parole, probation, or suspension of sentence; however, this is not reflected in the court minutes. Thus, the trial court is hereby instructed to amend the court minutes of sentencing to correctly reflect the sentence imposed by the trial court. *State v. Perry*, 08-1304 (La.App. 3 Cir. 5/6/09), 9 So.3d 342, *writ denied*, 09-1955 (La. 6/25/10), 38 So.3d 352; *State v. Blue*, 09-1111 (La.App. 3 Cir. 4/7/10), 34 So.3d 447.

*Sufficiency of the Evidence*

Defendant contends that the State failed to prove that he had the specific intent to kill Corporal Carla Whitstine. Defendant contends that he was simply trying to escape the scene because he had been shot and was terrified. He claims that there was no other visible way to escape and that the evidence presented does not support a finding that he purposely hit Whitstine in an attempt to kill her or to cause her great bodily harm.

Louisiana Revised Statutes 14:30(A)(2) provides:

> A. First degree murder is the killing of a human being:
>
> (2) When the offender has a specific intent to kill or to inflict great bodily harm upon a fireman, peace officer, or civilian employee of the Louisiana State Police Crime Laboratory or any other forensic laboratory engaged in the performance of his lawful duties, or when the specific intent to kill or to inflict great bodily harm is directly related to the victim's status as a fireman, peace officer, or civilian employee.

An attempt is defined in La.R.S. 14:27 as follows:

> A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

"The crime of attempted murder, whether first or second degree, requires proof of the specific intent to kill and the commission of an overt act tending toward the

3

accomplishment of that goal." *State v. Girod*, 94-853, pp. 5-6 (La.App. 5 Cir. 3/15/95), 653 So.2d 664, 668.

At trial, Whitstine, a corporal on the street team for the Alexandria Police Department, testified that she and her team patrol the streets in unmarked vehicles. They wear black t-shirts with white writing across the front that says "Police." The back says "APD Street Team." The area in which the incident occurred is a high crime area and is one of the main areas targeted. According to Whitstine, her vehicle is a common sight in that area and is well known to everyone.[1]

At approximately 10:30 p.m. on the night of May 7, 2009, Whitstine was patrolling with Corporals Sellers, Wolf, and Thomas when they noticed an SUV with Mississippi tags stopped in the road. The vehicle was in the roadway close to the curb, and it had its headlights on. Whitstine testified that she saw two men walk up to the vehicle. Because this is something they watch for in that it is indicative of a drug transfer, the team decided to stop and interview the people involved. As Whitstine approached the driver's side of the SUV, the driver started revving the engine, but the vehicle did not move. Whitstine testified that she saw the front passenger fumbling around with something. As Whitstine arrived at the window of the car, she saw the driver reaching for the gearshift to put the car in gear. She yelled "Stop, police" and then reached for the gearshift to prevent the driver from putting the vehicle in gear. At that point, she noticed that the driver had a black handgun in his lap. Whitstine yelled "gun" to alert the other officers. The driver grabbed the gun, and Whitstine grabbed the top of his hands; the two struggled over the gun. The driver was successful in getting control of the gun, and he handed it off to the passenger, who opened his door and took off running. Whitstine further testified that she took off running around the front of the vehicle to chase the person with the gun. When she got in front of the vehicle, the vehicle accelerated and hit her. Whitstine described the incident as follows:

---

[1]Whitstine testified without objection that "everybody" knows their vehicle.

Q    And what happened - - what did you hear when you got in front of that vehicle?

A    The vehicle accelerated.

Q    Did the vehicle move?

A    Yes.

Q    Did it come - - did it suddenly come toward you?

A    It started coming toward me.  I mean, he stomped it.  I mean, you could hear the accelerator.  All I could do was put my hands up, holler stop, and it hit me at that time.  I was not far in front of it when he started.

Q    Was it continuing to move forward and accelerate?

A    Yes.

Q    Did you - - what did you grab hold of?

A    I ended up on the hood of the vehicle with it still going down the street.  Uh, my feet were dangling, hitting the roadway, and all I could do was keep pushing up off the street to keep from going underneath the vehicle.

Q    What do you think would happen to you if you'd gone under that vehicle?

A    It would have ran [sic] over me.

Q    Why [sic] you were on that vehicle, holding on, the vehicle's continuing to move and accelerate?

A    Yes.

Q    Did you hear gunshots?

A    Yes.

Q    When you heard those gunshots, what movement did the vehicle make?

A    When I heard the gunshots, the vehicle immediately swerved left.  Like I say he's going down Prospect toward Monroe Street, and when the gunshots went off he swerved left real hard causing me to tumble off the hood onto the sidewalk, on the other sidewalk.

Q    So that - - so you fell off to the side and not in front of the vehicle?

A    Correct.

Q    Because the vehicle ...

A    Swerved.

5

Q       ... swerved.

A       Yes.

Whitstine testified on cross examination that the vehicle traveled about halfway down the block with her on the hood. After Whitstine fell off the vehicle, the driver continued down the street and hit a fire hydrant or a light pole, then fled on foot. Whitstine was bruised across the chest, and her knees were sore from being hit by the SUV. She required treatment at the hospital for several hours and was unable work for three weeks. Whitstine identified Defendant as the driver of the vehicle when subsequently shown a photographic lineup.

Corporal Chad Sellers, another member of the Alexandria Police Department street team, testified that he approached Defendant's vehicle right behind Whitstine. When the passenger, Lonnie Johnson, exited the vehicle with the gun, Sellers ran behind the vehicle toward the passenger.[2] The passenger dropped the gun, and as he continued running, Sellers tackled him. A short time later, Sellers retrieved the gun.

On cross-examination, Sellers was asked about the direction he chose to run to chase the passenger:

> A       He ran towards the front of the vehicle on Prospect headed towards Monroe.
>
> Q       Okay. So, wouldn't it have been more prudent for you to run toward the front of the vehicle as well too, if you were chasing him?
>
> A       No.
>
> Q       Okay. You were at - - toward the front passenger's seat as you said because you were looking in the vehicle, right? Well, watching the [sic].
>
> A       I was at the driver's side.
>
> Q       The driver's side?
>
> A       Yes.
>
> Q       You were looking in the vehicle?
>
> A       Yes.

_____

[2]Sellers testified that he observed the Defendant toss the gun to the passenger.

6

Q    Mr. Johnson jumps out of the passenger's seat, front passenger's seat, and runs, runs in a south, it would be a southeasterly direction according to what you said towards the front of the vehicle, is that correct?

A    Yes.

Q    Okay. But you said it was more prudent for you to run behind the vehicle and then chase him instead of going the direction that he was already heading in? That doesn't make sense, Officer.

A    That's the direction I chose. We're talking about something that happened within a few seconds. I guess maybe it's generally safer for us to approach a vehicle from the back than it is to the front to keep from getting...

Q    But there was no one else - - there was no one else in the vehicle was there?

A    The driver was in the vehicle.

Q    Yeah, but he was engaged with Officer Whitstine.

A    Yes.

Q    Okay.

A    And he was also attempting to take off. The vehicle is in gear, and I didn't want to get run over.

Q    So he'd already started to take off in the vehicle, is that what you're saying?

A    No, I'm, I'm saying that I reacted to the situation and I ran around him behind the vehicle. Maybe it was just luck that I didn't run in front of it.

Q    Well, Officer, you just said he was attempting to take off in the vehicle. Was he attempting to take off in the vehicle?

A    Yes.

Q    Okay. Before you started running?

A    Yes.

On redirect examination, Sellers explained that once the driver passed the gun to the passenger, his focus was on the passenger.

Corporal William Wolf testified that he heard no noise coming from the SUV as they initially approached it. After Whitstine's struggle with Defendant, when she ran in front of the vehicle, Wolf said that he heard "maximum acceleration" and that he saw the vehicle lurch forward and hit Whitstine. Wolf testified that they all were

7

yelling for the driver to stop. As the vehicle was still lurching forward and Whitstine was on the hood, Wolf made his way to the open passenger door and fired a shot at the driver because he was in fear for his partner's life.

Wolf described the incident as follows:

A    Um, I heard her a number of times saying he's got the gun, gun, he's got the gun, and then I believe she said that the passenger had the gun. Yeah.

Q    Okay. When you heard that, what did you do?

A    Uh, well, at this point in time, Corporal Whitstine had been, had ran [sic] toward the front of the car, and this all happened simultaneously. She ran toward the front of the car as the passenger exited out of the right side of this vehicle. Corporal Sellers was right behind him; Corporal Whitstine went around to the front of the vehicle towards, who, what I believe, she thought still had the gun, that suspect, the person that was running she thought still had the weapon.

Q    Okay. And did the vehicle do anything at that point. When Whitstine comes around the front of the vehicle...

A    Yes, sir.

Q    ... what did the vehicle do?

A    That's when the vehicle struck her.

Q    When it what?

A    When it struck her.

Q    Okay. Describe the, the action of that vehicle.

A    The best I can, and I don't know what, any history of the vehicle [sic], but I heard maximum, maximum acceleration. I saw the vehicle ...

     . . . .

A    Um, I saw the vehicle lurch forward, and I saw Corporal Whitstine go on top of the hood of the vehicle. At the same time this happened is when the passenger ran out at about a 45-degree angle from that vehicle and Corporal Sellers chased after him.

Q    When you saw the vehicle going forward making noises of acceleration ...

A    Yeah.

Q    ... and Whitstine in front of it and/or on the hood ...

A    Yes, sir.

Q    ... what did you think?

A    She's immediately being run over by this car. There was, there was, I had to, you know, my, my attention had to stay there. This was ongoing and this is happening in a matter of seconds.

Q    So, and what did you do?

A    Uh, I started working my way around the open side passenger door of the vehicle. This was on the right hand side of the vehicle.

Q    Is the vehicle still moving forward?

A    Yes, it's still lurching forward.

Q    Is Whitstine still in front of/on the vehicle?

A    Absolutely. I saw her with both, both her hands on the hood of the car hollering, hollering stop.

Q    And this - - all this is happening pretty quickly, right?

A    Yes, sir, in a matter of seconds.

Q    So what did you do?

A    At, uh, I had worked around to the, um, ran up to the passenger side of the door, hollering, you know, we were all hollering stop. Carla was, uh, or Corporal Whitstine was starting to get a little - - you could tell that this was getting to be a panic situation, and, uh, at that point I produced my, um, issued weapon and fired a shot.

On cross-examination, Wolf testified that when the passenger took off running, he went to the back of the vehicle and that is when the vehicle was in contact with Whitstine. In the report he wrote, Sellers said that he saw the vehicle lurch forward several times, and he testified that he believes it came in contact with Whitstine the first time it lurched forward.

After the shot was fired, the vehicle "sort of lulled" and veered to the left. At that point, Whitstine fell off the car and landed on the sidewalk on the right side of the vehicle. The vehicle subsequently hit a telephone pole, and Defendant fled the scene.

Corporal Kenneth Thomas testified that after Whitstine yelled that there was a gun, she ran around the front of the vehicle. The vehicle moved forward and hit her, and she fell onto the hood. When asked if the vehicle continued to move forward,

Thomas responded that "It would lunge at times, yes." His concern was that Whitstine would get caught underneath the vehicle or get hit by a tire and would be killed. Because he felt that Whitstine was in danger and needed assistance, Thomas fired a round at the driver. According to Thomas, after the shots were fired at the driver, the vehicle went through an intersection and crashed into a fire hydrant. He estimated that just a few seconds lapsed between the time that Whitstine yelled "gun" until he fired his weapon. On cross-examination, Thomas testified that the driver was revving the engine at the time Whitstine ran around the vehicle. According to Thomas, the driver took off "faster than normal."

Defendant testified that after Whitstine ran around the car to chase the passenger, he put his hands up and stayed in the parked vehicle. As the officers approached the vehicle after chasing Johnson, Defendant saw a gun facing him. Defendant claims that he panicked and took off in the vehicle after he was shot in the leg. Defendant denied hitting Corporal Whitstine with the vehicle, and he denied that she was ever on the vehicle.[3]

In *State v. Taylor*, 96-320, pp. 9-10 (La.App. 3 Cir. 11/6/96), 683 So.2d 1309, *writ denied*, 96-2828 (La. 6/20/97), 695 So.2d 1348, 1314-15, this court upheld the defendant's conviction for attempted manslaughter reasoning as follows:

> Officers Stelly and Mosely identified Taylor as the driver. The officers, along with Menard and Cahee, indicated that Taylor had room to drive away without turning the car toward Officer Mosely. The victim testified that he saw Taylor look straight at him as Taylor drove the car in his direction. After Officer Mosely landed on the car's hood, Taylor continued to accelerate and swerve the car against the express orders of Officer Mosely, whose only protection from falling off the front of the car was his one-hand grip on the car's windshield wiper. Taylor then took a sharp right turn at approximately forty miles per hour, which threw Officer Mosely to the street pavement. Taylor then sped off.
>
> This evidence was sufficient to infer from the circumstances that Taylor intended to kill Officer Mosely. The overt act of driving toward a person straddling a bicycle, carrying that person 253 feet on the car's hood in a zigzagging manner at a high rate of speed, then turning the car sharply and throwing the person from the car, when reviewed in a light

---

[3]Defense counsel's theory of defense advanced in his closing argument is consistent with what is being argued on appeal.

most favorable to the prosecution, manifests an intent to kill. This assignment of error is without merit.

In *State v. Austin*, 04-993 (La.App. 5 Cir. 3/1/05), 900 So.2d 867, *writ denied*, 05-830 (La. 11/28/05), 916 So.2d 143, the defendant's convictions for attempted first degree murder of Detectives Jewell and Pizzolato were upheld. The pertinent facts of the case are as follows:

> Upon receiving the takedown order, Troopers Bergeron and Baron moved in and parked their undercover vehicle at an angle behind the defendant's Yukon. Detective Jewell ran from his undercover vehicle and positioned himself on the median in front of the Yukon, facing the passenger's side headlight. Troopers Bergeron and Baron got out of their vehicle and stood behind the Yukon.

> All the officers repeatedly ordered the defendant to stop and surrender, but instead the defendant backed out of his parking space. According to Troopers Bergeron and Baron, the defendant backed toward them, but they moved out of the way. The Yukon ultimately collided with the undercover vehicle. Trooper Derrick Stewart, who was on foot in the parking lot, testified that he fired at the Yukon when it narrowly missed Trooper Bergeron.

> At that point, Detectives Jewell, Pizzolato and Boilan were on foot in front of the Yukon, wearing marked police clothing. They too repeatedly ordered the defendant to stop. However, the defendant placed the vehicle in gear and accelerated forward. All three officers fired their weapons at the defendant: Detective Boilan, who had moved away from Detectives Jewell and Pizzolato and was in the clear, fired in defense of the two detectives, while Detectives Jewell and Pizzolato fired in defense of their own lives.

> Detective Pizzolato testified that he moved out of the way. Detective Jewell testified that he was watching the defendant through the window and saw him violently jerk the wheel and turn his body, causing the Yukon to swerve to the right. The Yukon missed Detective Jewell by approximately eighteen inches. As Detective Jewell followed alongside the Yukon, he heard the vehicle's RPMs increase. He fired another shot into the Yukon to divert the defendant from "going at" Detective Davis.

> Detective Davis testified that the Yukon proceeded straight, but then accelerated toward him. Detective Davis did not discharge his weapon at the Yukon, and he was able to move to safety. The Yukon then passed through an outlet in Chevy's parking lot, ran over the median, and crashed into a light pole in the Palace Theatre's parking lot. Detective Boilan was beside the vehicle after it crashed. He heard a loud explosion, which he thought was gunfire, and fired into the driver's side window of the Yukon. The officers subsequently determined, however, that the defendant was unarmed.

*Id.*, 873-74 (footnotes omitted).

In upholding the defendant's convictions, the fifth circuit reasoned as follows:

In *State v. Jones*, 03-180 (La.App. 3 Cir. 9/10/03), 855 So.2d 408, *writ denied*, *State ex rel. Hancock v. State*, 04-0409 (La.1/14/05), 889 So.2d 262, the court found the evidence was sufficient for the jury to infer that the defendant had the specific intent to kill a deputy sheriff and affirmed the defendant's conviction of attempted second-degree murder. In Jones, the officer pursued the defendant's vehicle on to a dead end street as it fled from a house that the defendant had burglarized. The vehicle came to a stop near a large fence located at the end of the street. The officer parked his vehicle on the road, got out of the car with his weapon drawn, and ordered the occupants of the truck to surrender. The officer said it appeared that the defendant looked in his rear view mirror and observed the officer standing on the road to the left of the driver's side door. However, the truck's engine revved and the vehicle backed toward the officer at a high rate of speed. The officer jumped on the trunk of his car to avoid being struck by the defendant. *Jones*, 03-180 at p. 2, 855 So.2d at 410.

The third circuit concluded that the circumstances indicated the defendant had the specific intent to kill the officer because the defendant drove straight at him while accelerating. The court noted that alternate routes were available to the defendant to avoid the officer. *Jones*, 03-180 at p. 6, 855 So.2d at 412.

In contrast, in *State v. Amos*, 550 So.2d 272 (La.App. 4 Cir.1989), the court concluded the evidence was insufficient to prove the defendant had the specific intent to kill to support his attempted manslaughter conviction. In that case, police officers were in pursuit of the defendant's vehicle, when two other officers parked their unmarked police car across the street, completely blocking the path of the defendant's vehicle. There was no way the defendant could avoid hitting the unmarked police vehicle, and the officers left the vehicle when they realized a collision was imminent. As the defendant approached the officers' car, he accelerated and veered to one side of the officers' car, toward an embankment where Officer Hacker was standing. The defendant hit the officers' car and the embankment, while narrowly missing Officer Hacker. 550 So.2d at 276.

In *Amos* the court concluded that the evidence did not support an intent to kill, as follows at 276:

The facts do not support a determination that Jackson [defendant] had a specific intent to kill Officer Hecker. It is much more probable that Jackson was merely trying to avoid hitting the police car head-on by veering towards one side. There is no evidence to suggest that he chose to veer to the side where Hecker was standing for any reason other than by chance.

In the present case, the defendant contends that he was merely trying to escape, not to kill any of the officers. However, we find that the State proved the defendant had the intent to kill Detectives Jewell and Pizzolato. The officers were visibly attired as police officers, had their weapons drawn, and were ordering the defendant to surrender. Detective Jewell was approximately four feet in front of the defendant's vehicle and Detective Pizzolato was within arm's length to the right of

Detective Jewell. According to Detective Jewell, the defendant looked at him, placed the vehicle in drive, revved the engine, and drove right at him. Detective Pizzolato similarly testified that the vehicle accelerated, the tires "chirped," and the defendant drove right at him. Both officers testified that they would have been struck had they not moved, and they both fired their weapons at the defendant's vehicle in self-defense.

According to Detective Boilan, both officers were in danger, and he fired his weapon at the Yukon to defend them. Although Detective Jewell admitted on cross-examination that the only path available to the defendant was to go forward because the troopers' car was behind the defendant, he acknowledged on re-direct examination that the defendant could have backed up and driven in another direction. Thus, this case is more similar to *State v. Jones*, where the defendant accelerated directly at the officer, than to *State v. Amos*, where the defendant landed in the officer's location by chance.

In closing argument the defendant vigorously argued that he was merely trying to evade arrest. By returning the guilty verdicts as to Detectives Jewell and Pizzolato, the jury obviously rejected the defendant's alternative hypothesis.

*Id.* at 876-77 (footnotes omitted).

In *State v. Mitchell*, 39,305 (La.App. 2 Cir. 2/17/05), 894 So.2d 1240, *writ denied*, 05-741 (La. 6/3/05), 903 So.2d 457, the second circuit upheld a conviction for attempted manslaughter where the officers testified that as they approached the defendant's vehicle and ordered the occupants to stop, the car accelerated towards one of the officers, and he feared being hit. After both officers shot into the vehicle, it decelerated and came to a stop. An eyewitness testified that despite the officers' attempts to stop the vehicle, he saw the vehicle speed up toward one of the officers as they fired at it. Another eyewitness testified that he saw the vehicle hesitate and move forward in the direction of the officer, who was on the sidewalk in front of the vehicle yelling for the vehicle to stop. One of the occupants of the vehicle testified that he exited the car when ordered to do so by the officers and that he recalled the car rolling forward despite police officers screaming for them to stop. The second circuit concluded that the evidence was sufficient to show that the defendant had the specific intent to kill the officer:

Here, the jury heard the testimony of Officer Presley and three eyewitness accounts of the events which showed that as the officer approached the white Mercedes, the driver accelerated toward the officer and almost hit him. Unlike Christaw, who heard the officers' commands and exited the vehicle, Mitchell instead attempted to run over

the officer. From this evidence, a rational jury could have reasonably concluded that Mitchell's actions in attempting to run over the police officer with the car, demonstrated that Mitchell possessed the specific intent to kill the officer.

*Id.* at 1252.

Viewing the evidence pursuant to the *Jackson* standard in the light most favorable to the State, we find that the evidence was sufficient to support the conviction for attempted first degree murder. The evidence supports the conclusion that Defendant accelerated the vehicle directly toward Whitstine, hit her, and drove with her on the hood of the vehicle despite multiple orders for him to stop. The testimony presented by the prosecution established that Defendant was not shot until after he hit Whitstine, which refutes his allegation on appeal that he panicked from being shot and was simply trying to escape.

Next, Defendant claims that the evidence does not support his conviction for being a felon in possession of a handgun. He contends that Johnson was found in possession of the handgun and that he had no knowledge of the handgun being in or around Johnson's person. While it is true that Johnson was ultimately found in possession of the handgun, Whitstine testified that the gun was in Defendant's lap before he passed it to Johnson. By convicting Defendant of this crime, the jury chose to believe Whitstine's testimony that Defendant was in possession of the gun. The State presented sufficient evidence to prove this offense beyond a reasonable doubt. Thus, we find that this assignment of error lacks merit.

*Denial of Defendant's Request for Adjournment*

Defendant contends that the trial judge erred in denying his request that the court adjourn for the day to give a defense witness the opportunity to speak with the witness's attorney prior to testifying. Defendant argues that this deprived him of the right to present his full defense.

> Both the Sixth Amendment of the United States Constitution and Article I, Section 16 of the Louisiana Constitution (1974) guarantee a criminal defendant the right to compulsory process and to present a defense. A defendant's right to compulsory process is the right to demand subpoenas for witnesses and the right to have

14

those subpoenas served. *State v. Gordon*, 01-734 (La.App. 5 Cir. 11/27/01), 803 So.2d 131, 148, *writs denied*, 2002-0362 (La.12/19/02), 833 So.2d 336 and 2002-0209 (La.2/14/03), 836 So.2d 134.

*State v. Jackson*, 07-84, p. 9 (La.App. 5 Cir. 6/26/07), 963 So.2d 432, 438, *writ denied*, 07-1666 (La.1/25/08), 973 So.2d 754.

> The trial court has great discretion in deciding whether to grant a continuance, and its ruling will not be overturned absent an abuse of discretion. *State v. Bourque*, 622 So.2d 198 (La.1993); *State v. Champion*, 412 So.2d 1048 (La.1982); La.C.Cr.P. art. 712. Further, we generally will not reverse a conviction due to an improper ruling on a continuance unless there is a showing of specific prejudice to the defendant as a result of the denial of the continuance. *State v. Strickland*, 94-0025 (La.11/1/96), 683 So.2d 218; *State v. Knighton*, 436 So.2d 1141 (La.1983).

*State v. Castleberry*, 98-1388, p. 11 (La.4/13/99), 758 So.2d 749, 759-60, *cert. denied*, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999).

*State v. D.T.*, 08-814, p. 34 (La.App. 3 Cir. 12/11/08), 998 So.2d 1258, 1281, *writ denied*, 09-624 (La. 11/25/09), 22 So.3d 171.

> "In order to show prejudicial error sufficient to warrant reversal, the defendant must show that the testimony the witness would have given would have been favorable to the defense and would indicate the possibility of a different result." *State v. Landry*, 03-1632, p. 11 (La.App. 4 Cir. 5/19/04), 876 So.2d 146, 153, *writ denied*, 04-1586 (La.11/15/04), 887 So.2d 474 (citing *State v. Stevenson*, 02-79 (La.App. 5 Cir. 4/30/02), 817 So.2d 343).

*State v. Tolliver*, 08-1486, p. 40 (La.App. 3 Cir. 5/13/09), 11 So.3d 584, 607-08, *writ denied*, 09-1441 (La. 2/26/10), 28 So.3d 269. "A motion for recess is evaluated by the same standards as a motion for a continuance." *State v. Williams*, 07-1407, p. 30 (La. 10/20/09), 22 So.3d 867, 889, *cert. denied*, __ U.S. __, 130 S.Ct. 3278 (2010).

Defendant called Chadwick Rachal as a witness at trial. Rachal was incarcerated at the time, as he had been arrested for armed robbery. Rachal wanted to discuss the matter with his own attorney prior to testifying at Defendant's trial. Rachal's attorney lived "[o]n the other side of New Orleans." Defense counsel asked for an adjournment to give Rachal an opportunity to speak with his own attorney. The trial court denied the request, finding that the matter should have been taken care of before trial. The trial court then stated the following:

15

> It's 3:30 in the afternoon and his attorney's [sic] in New Orleans and he's here. So, he's not going to testify. He's not available to you, so, you're not going to be able to call him. Well, you can call him, but he's not going to testify, and I'm not going to allow him to take his privilege in the presence of the jury either for obvious reasons.

The State asserts that Defendant did not proffer the testimony of Rachal nor did appellate counsel give any indication of the nature of the testimony Rachal would have given. Therefore, there is nothing for this court to review. In support of this argument, the State cites *State v. M.M.*, 00-1296 (La.App. 3 Cir. 8/29/01), 802 So.2d 43, *writ denied, State v. Morris*, 01-3370 (La. 10/4/02), 826 So.2d 1121.

In *M.M.*, the defendant called Malloy as a witness, and Malloy asserted his Fifth Amendment privilege. Defense counsel requested that Malloy be given immunity so that he would testify. The trial court denied the request. On appeal, the defendant argued that because the trial court denied him the opportunity to secure Malloy's testimony, the trial court erred when it denied his "Motion to Use Hearsay Statements of Mark Harris." The motion alleged that Malloy had told Murray, an attorney, that Harris confessed to the murders of the defendant's parents. It further alleged that Harris was dead and that Malloy was unavailable to testify because of the State's refusal to grant him immunity. At a pre-trial hearing, the trial court held the information which Malloy gave Murray was privileged.

This court noted that the defendant failed to re-urge his motion at trial. Additionally, there was no indication that Malloy was called as a witness at trial and asserted his Fifth Amendment privilege. This court further stated:

> Accordingly, to preserve for review the issue regarding Mr. Murray's testimony exclusion, the Defendant should have called Mr. Malloy as a trial witness and upon Mr. Malloy's supposed eventual invocation of his Fifth amendment rights, he should have re-urged his motion to present Mr. Murray's testimony. Then, had the trial court denied the motion again, he should have proffered his testimony. Although this procedure appears fastidious and somewhat repetitive, it is designed to allow proper appellate review. Indeed, absent a record of Mr. Murray's testimony, we have nothing to review on appeal.

*Id*. at 67.

Defendant did not proffer the testimony of Rachal or indicate in any way to what Rachal would have testified. Therefore, Defendant cannot prove he was

16

prejudiced by the trial court's failure to adjourn. Accordingly, we find that this assignment of error lacks merit and that Defendant is precluded from raising the issue on appeal. *See M.M.*, 802 So.2d 43; *State v. Guillory*, 97-179 (La.App. 3 Cir. 3/11/98), 715 So.2d 400, *writ denied*, 98-955 (La. 10/9/98), 726 So.2d 17; *State v. Ayo*, 08-468 (La.App. 5 Cir. 3/24/09), 7 So.3d 85, *writ denied*, 09-1026 (La. 3/5/10), 28 So.3d 1006.

**DECREE**

For all of the foregoing reasons, Defendant's convictions are affirmed. However, the trial court is hereby instructed to amend the court minutes of sentencing to correctly reflect that the fifteen year sentence imposed by the trial court for possession of a firearm by a convicted felon is to be served without the benefit of parole, probation, or suspension of sentence.

**AFFIRMED WITH INSTRUCTIONS.**